BLANK ROME, LLP
Attorneys for Plaintiffs
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10006
(212) 885-5149

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE McKENNA**

**'07 CIV 7085**

07 Civ.

**VERIFIED COMPLAINT**

---

JACOB
TANKSCHIFFAHRTSGESELLSCHAFT
GMBH & CO. KG and LOS ROQUES
SHIPPING LTD., as Owner of the M/V
LOS ROQUES,

          Plaintiffs,

    v.

MILAN SHIPPING CO. LTD.,

          Defendant.

---



RECEIVED
AUG 0 9 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs JACOB TANKSCHIFFAHRTSGESELLSCHAFT GMBH & CO. KG

and ("Jacob") LOS ROQUES SHIPPING LTD. ("Los Roques"), as Owner of the M/V

LOS ROQUES (collectively "Plaintiffs" or "Owners"), by its attorneys Blank Rome,

LLP, complaining of the above-named Defendant MILAN SHIPPING CO. LTD.

("Defendant" or "Milan"), allege upon information and belief as follows:

    1.    This is a case of admiralty and maritime jurisdiction, as hereinafter more

fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of

the Federal Rules of Civil Procedure. The Court has subject matter jurisdiction.

2.     At all material times, Plaintiffs were and now are foreign companies organized and existing under the laws of Germany and the owner of the Motor Vessel LOS ROQUES (the "Vessel").

3.     At all material times, defendant MILAN SHIPPING CO. LTD. was and now is a corporation organized and existing under the laws of Malta.

### THE BASIC FACTS

4.     Jacob entered into a time charter party dated July 31, 2003 with Milan, as charterer of a vessel owned by a "company to be nominated by" Jacob for the Vessel "M/V LOS ROQUES (the "Vessel") Ex. 1[1] (the "Charter").

5.     The Charter was for a period of five years and, in rider Clause 27 contained a London arbitration clause.

6.     Jacob nominated Los Roques as the Vessel's Owner.

7.     On or about March 28, 2005 Milan, as disponent owner of the Vessel, loaded on the Vessel a cargo of oil in Russia which was carried to and discharged at Trieste, Italy to the endorsees of the bills of lading for the cargo, BP Oil International Ltd. ("BP"). Ex. 2

8.     BP claimed a shortage of cargo for which it claimed $225,089 plus interest and costs and held the Vessel liable in rem and obtained a letter of undertaking (the "Claim").

---

[1] Exhibits are attached to the accompanying Rule B affidavit.

9.    On or about June 15, 2007 Los Roques agreed to full and final settlement of the Claim in consideration of payment to BP of the sum of $190,000, which sum has been paid (the "Settlement Payment").

10.    A true copy of the settlement agreement executed by BP and Los Roques authorized representatives is Exhibit 2 to the accompanying Rule B affidavit.

11.    Despite due demand for reimbursement for the Settlement Payment, and/or a letter of undertaking from Milan's cargo underwriter or protection and indemnity club, neither payment nor security has been provided to date.

12.    Accordingly, Owners have nominated an arbitrator and demand London arbitration under the Charter.

13.    Owners claim for indemnity under the Charter is "ripe" in that it is not contingent but in a fixed, paid amount as recorded in and paid pursuant to the Settlement Agreement.

14.    This action is expressly filed without prejudice to the right of London arbitration.

## COUNT I

## RULE B RELIEF

15.    Plaintiffs repeat paragraphs 1 through 14 as if fully set forth herein.

16.    Plaintiffs seek issuance of process of maritime attachment so that it may obtain security for its claims including its English attorneys' fees and arbitrators' fees which are routinely awarded in London arbitration and no security for Plaintiffs' claim has been posted by Defendant or anyone acting on its behalf to date.

17.    At best as can now be estimated, Plaintiffs expect to recover the following amounts in the arbitration:

| | | |
|---|---|---|
| A. | On the principal claim | $190,000 |
| B. | Estimated Recoverable English Lawyers and Arbitrators' Fees & "Costs" | $ 80,000 |
| C. | Interest over the course of 3 years at prime rate average of 8% per annum: | $ 45,600 |
| | **TOTAL:** | $315,600 |

18.    Defendant cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"), but is believed to have, or will have during the pendency of this action, assets in this jurisdiction.

**WHEREFORE**, Plaintiffs pray:

A.    That process in due form of law issue against Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That since Defendant cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of Defendant's tangible or intangible property or any other funds held by any garnishee, which are due and owing to Defendant up to the amount of $315,600 to secure the Plaintiffs' claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B, answer the matters alleged in the Verified Complaint;

    C.      That this Court retain jurisdiction over this matter through the entry of a judgment or award associated with the pending claims including appeals thereof.

    D.      That Plaintiffs may have such other, further and different relief as may be just and proper.

Dated: New York, NY
       August 8, 2007

                            Respectfully submitted,
                            BLANK ROME, LLP
                            Attorneys for Plaintiffs

                            By
                            Jeremy J.O. Harwood (JH 9012)
                            405 Lexington Avenue
                            New York, NY 10174
                            Tel.: (212) 885-5000

## VERIFICATION

STATE OF NEW YORK      )
                             : ss.:
COUNTY OF NEW YORK    )

Jeremy J.O. Harwood, being duly sworn, deposes and says:

1.     I am a member of the bar of this Honorable Court and of the firm of Blank Rome, LLP, attorneys for Plaintiffs.

2.     I have read the foregoing Complaint and I believe the contents thereof are true.

3.     The reason this Verification is made by deponent and not by Plaintiffs is that Plaintiffs are foreign corporations, no officer or director of which is within this jurisdiction.

4.     The sources of my information and belief are documents provided to me and statements made to me by representatives of Plaintiffs.

_____
Jeremy J.O. Harwood

Sworn to before me this
8th day of August, 2007

_____
Notary Public

KARL V. REDA
Notary Public, State of New York
No. 30-4783126, Qual. in Nassau Cty.
Certificate Filed in New York County
Commission Expires *Nov. 30, 2009*

BLANK ROME, LLP
Attorneys for Plaintiffs
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JACOB TANKSCHIFFAHRTSGESELLSCHAFT GMBH & CO. KG and LOS ROQUES SHIPPING LTD., as Owner of the M/V LOS ROQUES,

                                   Plaintiffs,

                v.

MILAN SHIPPING CO. LTD.,

                                   Defendant.

07 Civ.

**AFFIDAVIT UNDER**
**SUPPLEMENTAL RULE B**

---

STATE OF NEW YORK      )
                       : ss.:
COUNTY OF NEW YORK     )

JEREMY J.O. HARWOOD, being duly sworn, deposes and says:

1.      I am a member of the Bar of this Honorable Court and a member of the firm of Blank Rome, LLP, attorneys for the Plaintiffs herein.  I am familiar with the circumstances of the complaint and submit this affidavit in support of Plaintiffs' request for the issuance of process of maritime attachment and garnishment of the property of defendant MILAN SHIPPING CO. LTD, a company organized and existing under the

laws of Malta, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

2.      The defendant is not incorporated or registered to do business in this State.

3.      Under my supervision, my office did a search of the New York State Secretary of State, Division of Corporations, Transportation Tickler (2006 edition), telephone assistance in New York City, and the internet Yellow Pages.

4.      In our search, we did not find any listing or reference to defendant in this district or state.

5.      In the circumstances, I believe the defendants cannot be "found" within this district.

6.      I attach as Exhibit 1 hereto a copy of the Charter dated July 31, 2003.

7.      I attach as Exhibit 2 hereto a copy of the Settlement Agreement.

_____
Jeremy J.O. Harwood

Sworn to before me this
8th day of August, 2007

_____
Notary Public

KARL V. REDA
Notary Public, State of New York
No. 30-4783126, Qual. in Nassau Cty.
Certificate Filed in New York County.
Commission Expires Nov. 30, 2009

Code word for this Charter Party
SHELLTIME 3

*Issued December 1984*

**30 JUN 2005**

# Time Charter Party

LONDON. 31st July 2003  19.

IT IS THIS DAY AGREED between a Company to be nominated by. Messrs. Jacob Tankschiffahrtsgesellschaft Gmbh & Co. KG of Germany (hereinafter referred to as "Owners"), being owners of the 1,2

good   Motor. Tanker   vessel called .'Los Roques'   3

(hereinafter referred to as "the vessel") described as per Clause 1 hereof and. Messrs. Milan Shipping Company Limited of 171 Old Bakery Street, Valletta VLT 09 of Malta   (hereinafter referred to as "Charterers"):   4,5

| | |
|---|---|
| **Description and Condition of Vessel** | 1.   At the date of delivery of the vessel under this charter   6 |

(a)   she shall be classed: See clause I of the rider   7

(b)   she shall be in every way fit to carry crude petroleum and/or its products; including condensate, carbon black, waxy residues and orimulsion   8

(c)   she shall be· tight, staunch, strong, in good /order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator and radar) in a good and efficient state:   9,10,11

(d)   her tanks, valves and pipelines shall be oil-tight;   12

(e)   she shall be in every way fitted for burning   13

> Intertanko Questionnaire 88 and OCIMF Questionnaire

at sea - fueloil with a maximum viscosity of                      Centistokes at 50 degrees Centigrade/any   14
commercial grade of fueloil (~~ACGFO~~) for main propulsion, ~~marine·diesel·oil/ACGFO~~ for auxiliaries   as well as   15,16
in port - ~~marine·diesel·oil/ACGFO~~ for auxiliaries;   17

(f)   she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals by day and night without delay;   18,19

(g)   she shall have on board. all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;   20,21

> See Vessel's description clause

(h)   she shall comply with the description in ~~Form·B~~ appended hereto, provided however that if there is any conflict between the provisions of ~~Form·B~~ and any other provision, including this Clause 1, of this charter such other provision shall govern.   22,23,24

> and throughout the entire period of this Charter Party

| | |
|---|---|
| **Shipboard Personnel and their Duties** | 2.   (a)   At the date of delivery of the vessel under this charter   25 |

(i)   she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state· and who shall be trained to operate the vessel and her equipment competently and safely;   26,27,28

(ii)   all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state;   29,30

> as amended from time to time

(iii)   all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978;   31,32

(iv)   there shall be· on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried out quickly and efficiently.   33,34,35,36

> (v) All shipboard personnel will comply with the OCIMF guidelines for the control of drugs and alcohol on board ship

(b)   Owners guarantee that throughout the charter service· the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers,   37

(i)   prosecute all voyages with the utmost despatch;   38

(ii)   render all customary assistance; and   40

(iii)   load and discharge cargo· as rapidly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.   41,42,43

| | |
|---|---|
| **Duty to Maintain** | 3.   (i)   Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.   44,45,46 |

(ii)   If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1.2(a)· or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel· to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost.   47,48,49,50,51

Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 24.   52,53,54

> (vi) Owners guarantee that the Owners, or management company as the case may be, shall always be in compliance with ISM code or any future relevant equivalent

(iii)   If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in writing: and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed   55,56

vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they ~~are exercising such due diligence.~~ 58
59

Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the option to terminate this charter by giving notice in writing with effect from the date on which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers rights under Clause 21 hereof). 60
61
62
63
64

**Period Trading Limits**

4. Owners agree to let and Charterers agree to hire the vessel for a period of (clause 23 of the rider) commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular See Trading Limits clause (3 of the rider) 65
66
67

~~in any part of the world, as Charterers shall direct, subject to the limits of the current British Institute Warranties and any subsequent amendments thereof. Notwithstanding the foregoing, but subject to Clause 35. Charterers may order the vessel to ice-bound waters or to any part of the world outside such limits provided that Owners consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters as a consequence of such order.~~ 68
69
70
71
72

Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and discharged at any places as Charterers may direct, provided that Charterers exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide. 73
74
75
76
77
78
79
80
81

The vessel shall be delivered by Owners at a port in 82

back to back with Memorandum of Agreement Clause 5 and Clause 20 of MOA dated
at Owners' option and redelivered to Owners at a port in          31st July 2003 83

worldwide within trading limits
at Charterers' option. 84

**Laydays/ Cancelling**

5. ~~The vessel shall not be delivered to Charterers before~~         **lubo1ls**         ~~and Charterers shall~~ 85
~~have the option of cancelling this charter if the vessel is not ready and at their disposal on or before~~ 86

**Owners to Provide**

6. Owners undertake to provide and to pay for all provisions, wages, and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water; for all drydocking, overhaul, maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire. 87
88
89
90
91
92
93
94
95
96

**Charterers to Provide**

7. Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given for distance made good and taken into account under Clause 21 or 22;) and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners. 97
98
99
100
101
102
103

**Rate of Hire**

8. Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of USD 16.250          per day, and pro rata for any part of a day, from the time and date of her delivery (local time) until the time and date of her redelivery (local time) to Owners. 104
105
106

UTC

**Payment of Hire**

9. Subject to Clause 3(iii), payment of hire shall be made in immediately available funds to: 107

                                          Account
in United States          per calendar month in advance, less: 108
109

Dollars (i) any hire paid which Charterers reasonably estimate to relate to off-hire periods, and
(ii) any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof, and
(iii) any amounts due or reasonably estimated to become due to Charterers under Clause 3(ii) or 24 hereof, 110
111
112
113
114

any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment. 115
116
117

(a) Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise and 118
119
120
121
122

(b) ~~Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime~~ 123
124

The Vessel shall be delivered to Charterers upon delivery of the vessel to the Owners as per Clause 5 of the Memorandum of Agreement dated 31st July 2003 (hereinafter to be referred to as "MOA" herewith attached. The Vessel shall not be delivered to Charterers before as stated in Clause 5 of the MOA and Charterers have

21

such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually. | 126 127 128

**Space Available to Charterers**
10. The whole reach, burthen and decks of the vessel, and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed **550** tonnes at any time during the charter period. | 129 130 131 132

**Overtime**
11. Overtime pay of the master, officers and crew in accordance with ship's articles shall be for ~~Charterers'~~ Owners account ~~when incurred~~, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning. Charterers shall pay together with hire lumpsum of US$ 2000 per month covering all the above. | 133 134 135

**Instructions and Logs**
12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master. Reports to be completed in English | 136 137 138 139 140 141

**Bills of Lading**
13. (a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise
(i) from signing bills of lading in accordance with the directions of Charterers, or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers or their agents orders;
(ii) from any irregularities in papers supplied by Charterers or their agents.
(b) Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo
(i) at any place other than that shown on the bill of lading and/or
(ii) without presentation of an original bill of lading
unless they have received from Charterers both written ~~confirmation of such orders and an indemnity in a form acceptable to Owners.~~ invoking the Letter of Undertaking as per additional Clause No. 25 | 142 143 144 145 146 147 148 149 150 151 152 153 154 155

**Conduct of Vessel's Personnel**
14. If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible. | 156 157 158 159

**Bunkers at Delivery and Redelivery**
15. Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then current market prices at the port of delivery or redelivery, ~~as the case may be, or if such prices are not available payment shall be at the then-current market prices at the nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a port payment shall be at the price paid at the Charterers' last port of bunkering before delivery or redelivery,~~ their respective purchase price which to be supported by vouchers" ~~as the case may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers, provided suppliers agree.~~ No bunker refundment on delivery | 160 161 162 163 164 165 166 167

**Stevedores, Pilots, Tugs**
16. Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that
(i) the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and
(ii) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores. | 168 169 170 171 172 173 174 175 176 177 178 179

**Supernumeraries**
17. Charterers may send representatives in the vessel's available accommodation upon any voyage made under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors. Charterers paying at the rate of **US$ 15** per day for each representative while on board the vessel. | 180 181 182

**Sub-letting**
18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter. | 183 184

**Final Voyage**
19. If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for
(i) disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and
(ii) bunkers on board at redelivery pursuant to Clause 15.
Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.
If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the | 185 186 187 188 189 190 191 192 193 194 195

191

**Loss of Vessel**

vessel at the same time and return to a port of redelivery as provided by this charter, as the case may be.

20. Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

**Off-hire**

21. (a)  On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service, or from reduction in the vessel's performance, or in any other manner)

| Time lost by the vessel for obtaining all necessary authorization or certificates for trading |

(i)  due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than three hours (if resulting from partial loss of service); or

(ii)  due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or

(iii)  for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours; or

(iv)  due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or

(v)  due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers);then

| vi) delay for failure in obtaining M.O.C. vetting approvals (see additional clause 22) |

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b)  If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between

(i)  the time the vessel would have required to perform the relevant service at such guaranteed speed, and

(ii)  the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.

| but Charterers shall have the option to add such time(s) to the relevant charter period with thirty (30) days notice to be given to Owners prior to natural expirationof each time charter period as the case may be (see clause 23 of the rider) |

(c)  Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby.

(d)  If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.

(e)  Time during which the vessel is off-hire under this charter shall ~~count as part of the charter period.~~ **not**

**Periodical Drydocking**

22. (a)  Owners have the right and obligation to drydock the vessel at regular intervals ~~of~~ **as required by** **Classification Society**. ~~On each occasion Owners shall propose to Charterers a date on which they wish to~~ drydock the vessel, not less than **ninety (90) days** before such date, and Charterers shall offer a port for such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as practicable.

~~Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be~~ responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of lading or this charter.

(b)  ~~If a periodical drydocking is carried out in the port offered by Charterers (which must have~~ suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However,

(i)  ~~provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether~~

275

~~(iii) any additional time lost in further gas-freeing to meet the standard required for that work or~~ 276
~~entry to cargo tanks shall count at off-hire, whether lost on passage to an anchoring port or after arrival there.~~

Any time which, but for ~~sub-Clause (i)~~ above, would be off-hire, shall not be included in any 277
~~calculation under Clause 24.~~ 278

~~The~~ expenses of gas-freeing, including without limitation the cost of bunkers, shall be for 279

| Time and |

Owners account. 280

(c) If Owners require the vessel, instead of ~~proceeding to the offered port,~~ to carry out periodical 281
drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to 282
proceed to the special port until she next presents for loading in accordance with Charterers' instructions, 283
provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at 284
the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but 285
Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage 286
calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any 287
benefit they may gain in purchasing bunkers at the special port. 288

~~(d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of~~ 289
~~tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which~~ 290
~~Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port.~~ 291

**Ship Inspection**

23. Charterers shall have the right at any time during the charter period to make such inspection of the 292
vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in 293
their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all 294
necessary co-operation and accommodation on board provided, however, 295

(i) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise 296
or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or 297
responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase 298
Charterers' responsibilities to Owners or third parties for the same; and 299

(ii) that Charterers shall not be liable for any act, neglect or default by themselves, their 300
servants or agents in the exercise or non-exercise of the aforesaid right. 301

**Detailed
Description
and Performance**

24. (a) Owners guarantee that the speed and consumption of the vessel shall be as follows: 302
See Vessel's description clause (n.1) and Overperformance clause (n.26)

Average speed            Maximum average bunker consumption 303
in knots                  main propulsion     -     auxiliaries 304
                              fuel oil/diesel oil/fuel oil/diesel oil 305

Laden                       tonnes              tonnes 306

Ballast 307

The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning 308
and shall be pro-rated between the speeds shown. 309

The service speed of the vessel is       knots laden and       knots in ballast and in the absence 310
of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one 311
laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to 312
steam at any speed within the range set out in the table (the "ordered speed"). 313

~~If the vessel is ordered to proceed at any speed other than the highest speed shown in the table~~ 314
and the average speed actually attained by the vessel during the currency of such order exceeds such ordered 315
speed plus 0.5 knots (the "maximum recognised speed"), ~~then for the purpose of calculating any increase or~~ 316
~~decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed~~ 317
~~actually attained.~~ 318

For the purposes of this charter the "guaranteed speed" at any time shall be the then-current 319
ordered speed or the service speed, as the case may be 320

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be 321
calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each 322
period stipulated in Clause 24 (c), but excluding any time during which the vessel is ~~(or but for Clause 22(b)~~ 323
~~would be)~~ off-hire and also excluding any periods during which reduction 324

of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when wind 325
exceed force 4 on the Beaufort Scale for more than 12 hours. 326

(b) If during any year from the date on which the vessel enters service (anniversary to anniversary) 327
the vessel falls below ~~or exceeds~~ the performance guaranteed in Clause 24(a) then if such shortfall ~~or excess~~ 328
results 329

(i) from a reduction ~~or an increase~~ in the average speed of the vessel, compared to the speed 330
guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost ~~or gained, as the~~ 331
~~case may be,~~ shall be deducted from ~~or added to~~ the hire paid: 332

(ii) from an increase ~~or a decrease~~ in the total bunkers consumed, compared to the total bunkers 333
which would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equivalent 334
to the value of the additional bunkers consumed ~~or the bunkers saved, as the case may be,~~ based on the average 335
price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid. 336

~~The addition to or~~ deduction from hire so calculated for laden and ballast mileage respectively 337
shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather 338
Periods, by dividing such ~~addition or~~ deduction by the number of miles over which the performance has been 339
calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather 340
Periods, in order to establish the total ~~addition to or~~ deduction from hire to be made for such period. 341

Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other 342
remedy available to Charterers. 343

(c) Calculations under this Clause 24 shall be made for the yearly periods terminating on each 344
successive anniversary of the date on which the vessel enters service, and for the period between the last such 345

arising under this Clause during the final year of party in accordance with Charterers' rights made two months before the end of the charter period. Any necessary adjustment after this charter terminates shall be made promptly by Owners to Charterers or by Charterers to Owners as the case may require.

Payment in respect of increase of hire arising under this Clause shall be made promptly after receipt by Charterers of all the information necessary to calculate such increase.

**Salvage**
25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses ( excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 25.

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share.

**Lien**
26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter.

**Exceptions**
27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people.

(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property.

(c) Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant person in respect of

(i) loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or

**Any**
(ii) any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the Hague-Visby Rules.

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire.

**Injurious Cargoes**
28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments.

**Grade of Bunkers**
29. Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of 380 Centistokes at 50 degrees Centigrade/AGGPO for main propulsion and diesel oil/AGGPO for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.

**according to RMG 35**
**according to DMB**
Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading Company and will to specification for marine fuels as amended from time to time.

**Disbursements**
30. Should the master require advances for ordinary disbursements at any port, Charterers or their agents shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire.

**Laying-up**
31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay-up, Charterers may exercise the said option any number of times during the charter period.

**Requisition**
32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition. and any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period. This cancellation to be declared within a period of 15days from the date in which Hull & Machinery insurers officially report the outbreak of such war

**Outbreak of War**
33. If war or hostilities break out between any two or more of the following countries: U.S.A., U.S.S.R., P.R.C., U.K., Netherlands both Owners and Charterers shall have the right to cancel this charter.

**Additional War Expenses**
34. If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war, Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.

If war or hostilities break out between any two or more of the following countries U.S.A. States belonging to Russia, P.R.C.,U.K., Netherlands, Germany, Italy, France in sofar such areas have been declared War Risk areas by the War Risk rating committee in London as recognised by the Lloyd's of London both Owners and Charterers shall have the right to cancel the Charter. However neither party shall be entitled to terminate this Charter Party on account minor and/or local warlike operations or economic warfare anywhere which will not interfere with vessel's trade

**War Risks**

Replaced by War Clause
of Intertanktime 80
as attached

35.  (a)  ~~The master shall not be required or bound to sign bills of lading for any place which in his or~~ 417
~~Owners reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any~~ blockade, 418
war, hostilities, warlike operations, civil war, civil commotions or revolutions. 419

(b)  If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in 420
Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach 421
or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter 422
(a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and 423
Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or 424
discharged, as the case may be, at any other place within the trading limits of this charter (provided such other 425
place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been 426
received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at 427
liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in 428
their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due 429
fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned. 430

(c)  The vessel shall have liberty to comply with any directions or recommendations as to departure, 431
arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever 432
given by the government of the state under whose flag the vessel sails or any other government or local authority 433
or by any person or body acting or purporting to act as or with the authority of any such government or local 434
authority including any de facto government or local authority or by any person or body acting or purporting to 435
act as or with the authority of any such government or local authority or by any committee or person having under 436
the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by 437
reason of or in compliance with any such directions or recommendations anything is done or is not done, such 438
shall not be deemed a deviation. 439

If by reason of or in compliance with any such direction or recommendation the vessel does not 440
proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed 441
to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part 442
of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners obligations under this 443
charter so far as cargo so discharged is concerned. 444

Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of 445
~~Shipping War Risks Clause 1952.~~ 446

**Both to Blame**
**Collision Clause**

36.  If the liability for any collision in which the vessel is involved while performing this charter falls to be 447
determined in accordance with the laws of the United States of America, the following provision shall apply: 448

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any 449
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the 450
management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or 451
liability to the other non-carrying ship or her owners in so far as such loss or liability represents loss of, or 452
damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying 453
ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying 454
ship or her owners as part of their claim against the carrying ship or carrier." 455

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship 456
or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or 457
contact." 458

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the 459
foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be 460
determined in accordance with the laws of the United States of America. 461

**New Jason**
**Clause**

37.  General average contributions shall be payable according to the York/Antwerp Rules, 1974, <ins>1994 as amended from time to time</ins> and shall 462
be adjusted in London in accordance with English law and practice but should adjustment be made in accordance 463
with the law and practice of the United States of America, the following provision shall apply: 464

"In the event of accident, danger, damage or disaster before or after the commencement of the 465
voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the 466
consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, 467
consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any 468
sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and 469
special charges incurred in respect of the cargo." 470

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said 471
salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover 472
the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by 473
the cargo, shippers, consignees or owners of the cargo to the carrier before delivery." 474

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the 475
foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and 476
practice of the United States of America. 477

**Clause**
**Paramount**

38.  Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the 478
following clause: 479

"(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by, and have effect subject 480
to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of 481
Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed 482
at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). ~~Nothing contained herein shall be~~ 483
deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his 484
responsibilities or liabilities under the "Hague-Visby Rules." 485

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading, 486
to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. 487
Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities 488
or an increase of any of his responsibilities or liabilities under the Hague Rules." 489

"(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if 490
applicable, such term shall be void to that extent but no further." 491

"(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the 492
right of any relevant party or person to limit his liability under any available legislation and/or law." 493

(i)   a tanker in TOVALOP; and

and will so remain during the currency of this charter.   497

When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution 498
Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the 499
escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or 500
not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to 501
Owners or master, undertake such measures as are reasonably necessary to prevent or minimise such Pollution 502
Damage or to remove the Threat, and Owners promptly undertake the same. Charterers shall keep Owners 503
advised of the nature and result of any such measures taken by them and, if time permits, the nature of the 504
measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be 505
deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that: 506
   (1)   any such escape or discharge or Threat was caused or contributed to by Charterers, or 507
   (2)   by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International 508
Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such 509
escape or discharge or to the Threat, would have been exempt from liability for the same, or 510
   (3)   the cost of such measures together with all other liabilities, costs and expenses of Owners arising 511
out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States 512
Dollars (US \$160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States 513
Dollars (US \$16,800,000), whichever is the lesser, save and insofar as Owners shall be entitled to recover such 514
excess under either the 1971 International Convention on the Establishment of an International Fund for 515
Compensation for Oil Pollution Damage or under CRISTAL; 516
   PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures 517
should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to 518
continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this 519
Clause 39 shall thereupon cease. 520
   The above provisions are not in derogation of such other rights as Charterers or Owners may have 521
under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP. 522
   The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability 523
for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the 524
Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as 525
amended from time to time. The terms "Oil", "Pollution Damage", and "Tonnage" shall for the purposes of this 526
Clause 39 have the meanings ascribed to them in TOVALOP. 527

See I.T.O.P.F. clause 28

**Export Restrictions**

40.   The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to 528
which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was 529
produced and/or shipped. 530
   Charterers shall procure that all bills of lading issued under this charter shall contain the following 531
clause: 532
   "If any laws rules or regulations applied by the government of the country in which the cargo was 533
produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo 534
to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to 535
require cargo owners forthwith to nominate an alternative discharge place for the discharge of the 536
cargo, or such part of it as may be affected, which alternative place shall not be subject to the 537
prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and 538
discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 539
hours after they or their agents have received from carriers notice of such prohibition, carriers shall be 540
at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place 541
on which they or the master may in their or his absolute discretion decide and which is not subject to the 542
prohibition, and such discharge shall constitute due performance of the contract contained in this bill 543
of lading so far as the cargo so discharged is concerned". 544
   The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading 545
being deemed to be references to this charter. 546

**Law and Litigation**

41. (a)   This charter shall be construed and the relations between the parties determined in accordance 547
with the laws of England. 548
   (b)   Any dispute arising under this charter shall be decided by the English Courts to whose 549 [as per]
jurisdiction the parties hereby agree. LMAA Arbitration Clause (see clause 27 of the rider) 550
   (c)   Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain 551
the arrest of any maritime property, either party may, by giving written notice of election to the other party elect 552
to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the 553
provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being 554
in force. 555
    A party shall lose its right to make such an election only if: 556
    (a)   it receives from the other party a written notice of dispute which— 557
     (1)   states expressly that a dispute has arisen out of this charter; 558
     (2)   specifies the nature of the dispute; and 559
     (3)   refers expressly to this clause 41(c) 560
    and 561
    (b)   it fails to give notice of election to have the dispute referred to arbitration not later than 562
30 days from the date of receipt of such notice of dispute. 563
   (ii)   The parties hereby agree that either party may — 564
    (a)   appeal to the High Court on any question of law arising out of an award; 565
    (b)   apply to the High Court for an order that the arbitrator state the reasons for his award; 566
    (c)   give notice to the arbitrator that a reasoned award is required; and 567
    (d)   apply to the High Court to determine any question of law arising in the course of the 568
reference. 569
   (d)   It shall be a condition precedent to the right of any party to a stay of any legal proceedings in 570
which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that 571

(c) for smaller disputes up to US\$ 100,000 the small claim procedure laid by the London Maritime
Arbitrators' Association and any subsequent amendment thereto shall apply.

Construction of Side Headings have been included in the charter for convenience of reference only and shall in no way affect the construction hereof.

574
575

Intertanktime 80 "War Clause" and "Charterers" additional clauses from No. 1 to No. 35 attached hereto shall form an integral part of this Charter Party.

This Charter Party is a computer generated copy of the SHELLTIME4 Charter Party form, printed using software which is the copyright of Strategic Software Limited.

This is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

THE OWNERS

JACOB TANKSCHIFFAHRTS-
GESELLSCHAFT MBH & Co. KG

THE CHARTERERS

MILAN SHIPPING COMPANY LIMITED
VALLETTA · MALTA

1.    **VESSEL'S DESCRIPTION CLAUSE**

Owners guarantee the following speed/consumption in moderate weather upto and including Beaufort Scale Force 5 (Five) excluding voyages of less than 24 hours and areas such as restricted channels and where slow speed is required by authorities of the port. Calculation to be made from full away on leaving last pilot to end of seapassage.

Owners have given the speed/consumption as per Charter Party but if they find that there is a difference in performance within the first 90 days after delivery, Owners are to notify Charterers and a mutual agreement to be reached after taking into account the performance figures of the last 5 voyages prior to delivery.

Class: +A1(E) OIL CARRIER:SH,+AMS:+ACCU
Deadweight: 71,562 mt on 14.122 m

Gross Tonnage: 40,705 tonnes
Net Tonnage: 21,529 tonnes

Main dimensions:
LOA: 228.2 m
LBP: 220.0 m
Beam: 32.2 m
Depth: 20.1 m

Cargo cubic capacity (including slop tanks): 80,012 m3 (98%)

Main engine/power: 6RTA62V/12,000 KW

Speed/consumption:

All consumption expressed in tonnes of IFO 380 per day, unless otherwise specified. Consumption up to beafourt 5 included.

| Ballast | Laden |
|---|---|
| 13.5 knots on 28.00 mt | 13.5 knots on 30.00 mt |
| 14.0 knots on 31.00 mt | 14.0 knots on 33.00 mt |
| 14.5 knots on 34.00 mt | 14.5 knots on 36.00 mt |

| | |
|---|---|
| Maintain Cargo Temperature upto 135 F | 6 Mt Ifo |
| Increase Temperature from 44 To 66 C | |
| (Air 0 Deg - Sea 5 Deg) in 96 Hours | 100 mt Ifo/Total |
| Inerting all tanks by IGS in flexinert mode | 5 mt Ifo X 36 Hrs |
| Inerting during discharge in flexinert mode | 3 mt Ifo |
| Diesel generators at Sea | 3 mt Ifo |

| | |
|---|---|
| Diesel generator idle | 2.5 mt Ifo |
| Boilers idle | 2.5 mt Ifo |
| Discharging in 24 hrs | 13 mt Ifo + 5 Mt of mgo |
| Loading | 3.5 mt Ifo |
| Ballasting/Deballasting | 2 mt Ifo X 12 Hrs |
| Butterworth all tanks about 36 hrs | 45 mt Ifo |
| Max Loading Rate | 12,000 cm/hr Homogeneous cargo, all tanks |
| Max loading rate per manifold | 5,000 Cm/Hr |
| Max loading rate per tank | 2,000 Cm/Hr Per Tank |

Vessels full description as given and vessel speed and consumptions are guaranteed as average speed for voyages over 24 hrs and subject to vessel not remaining idle in tropical waters for more than 7 days.

| | |
|---|---|
| Cargo System/pumps: | 10 Deep well Framo centrifugal Hydraulic pumps of 900 cu.m/hr capacity |
| | + 2 Deep well Framo centrifugal Hydraulic pumps of 300 cu.m/hr capacity |
| Ballast system/pumps: | 2 Centrifugal Hydraulic pumps of 1,100 cu.m/hr capacity |
| Auxiliary boilers: | 2 Aalborg 14t/hrs at 8 bars |
| Mooring equipment: | 2 combined windlass/winches double split drum |
| | 4 winches double split drum |
| Lifting equipment: | Hydraulic Cargo Hose Crane 15 ton SWL |

## 2.    COFR CLAUSE

If U.S.A. trade all cost payable per call related to COFR and OPA 90 to be paid by Charterers to Owners against relevant documents. Owners to pass any relevant discount on the above to Charterers.

## 3.    TRADING LIMITS CLAUSE

Vessel to trade between good and safe ports/places, always afloat, worldwide within the current Institute Warranty Limits, however excluding: Israel, Albania, any voyage which will incur the risk of black listing and/or boycotting, war zones as defined by Lloyds of London and any other areas to which restrictions may be imposed by the United States or the flag state. Charterers may be allowed to order the ship to any war zones as defined by Lloyd's of London or to breach Institute Warranty Limits (as the case may be) upon payment by Charterers of any additional insurance premiums required by the Vessel's Underwriters for such breach subject to Owners' prior consent which shall not be unreasonably withheld. If during the course of the Charter,

political events in any country make it generally acceptable to the tanker industry for the country to be added to the trading exclusion or alternatively if the tanker industry generally accept that is no longer necessary for the country to be included in the trading exclusions, then both parties undertake to act reasonably in all circumstances, in the spirit of good cooperation, to discuss and reach a conclusion on the inclusion or exclusion of said country within the trading limits of this charter party.

### 4.    EXXON DRUG CLAUSE

Owners warrant that it has a policy on drug and Alcohol abuse ('Policy") applicable to the vessel which meets or exceeds the standards in the Oil International Marine Forum Guidelines for the Control of Drug and Alcohol onboard Ship. Under the Policy, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater, the appropriate seafarers to be tested shall be all vessel's officers and the drug / alcohol testing and screening shall include unannounced testing in addition to routine medical examinations. An objective of the Policy should be that the frequency of the unannounced test be adequate to be as an effective abuse deterrent, and that all officers to be tested at least once a year through a combined program of announced testing, and routine medical examinations.
Owners further warrant that the policy will remain in effect during the term of this charter and that the owners shall exercise due diligence to ensure that the policy is complied with.

### 5.    DETENTION CLAUSE

Should the vessel be seized or detained by any authority or arrested at the suit of any party having or purporting to have a claim against any interest of the vessel borne by the owner, hire shall not be payable in respect of any period during which the vessel is not at Charterers' use and all extra expenses shall be for Owners' account.

### 6.    STS - LIGHTERING CLAUSE

Owners shall allow transfer of cargo between the vessel and another vessel made fast alongside or while underway. However such procedure always subject to master's approval and to be in accordance with the ICS/OCIMF Ship to Ship Transfer guide (Petroleum). All extra equipment required and extra expenses incurred for such transfer operation shall be provided by Charterers for their account.

### 7.    FINANCIAL RESPONSABILITY IN RESPECT OF POLLUTION CLAUSE

(1)    Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

    (a)    Certificates issued pursuant to the Civil Liability Convention 1969 ('CLC"), and pursuant to the 1992 protocols to the CLC, as and when in force

    (b)    Certificates issued pursuant to the Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138

of Coast Guard Regulations 3 CFR, so long as these can be obtained by the owners from or by (identify the applicable scheme or schemes)

(c)      Any other similar certificates of responsibility which may be required of Owners during the currency of this Charter Party to the extent that such certification can be readily and commercially obtained such that a prudent owner trading for his own account would obtain such certification.

(2)  Notwithstanding anything whether printed or typed herein to the contrary,

(a)      save as required for compliance with paragraph (1) hereof, owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

(b)      Charterers shall indemnify owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c)      Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which charterers and/or the holders of any bill of lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(3)  Owners warrant that they have and will maintain through the period of this charter party the Standard Oil Pollution Insurance cover issued by the vessel's P & I club (currently USD One billion)

(4)  if requested by Charterers, Owners shall promptly furnish to the Charterers proper evidence of such P & I Insurance and Excess Insurance immediately upon signing this charter or any time during the charter term. The above warranty is to be regarded as an essential part of this charter, which is conditional on its truth or performance, so that the breach entitles the charterers in charterer's option, to terminate the charter and/or recover any damages allowable in Law.

Charterers warrant that terms of this clause will be incorporated effectively into any bill of lading issued pursuant to this charter.

## 8.  NOTICE CLAUSE

Owners to give 20-15-7-3 days, Charterers to give 30-15-7 days estimate notice and 5-3-1 days final notice of delivery and redelivery respectively.

## 9.    ENGLISH LANGUAGE CLAUSE

Owners/Managers undertake to have English speaking personnel available to ensure appropriate communications between Charterers/Owners/Managers/Agents/ Authorities/ Terminal Officials.

## 10.    CHANGE OF OWNERSHIP CLAUSE

Owners not to sell the vessel nor to change management of the vessel during currency of this Charter Party, without prior agreement with Charterers, which shall not unreasonably withheld. The Charterers shall be deemed to have given their consent for any sale of the vessel where the Owners retain the beneficial ownership and control of the vessel and vessel's management company remains unchanged.

## 11.    REMEASURING CLAUSE

Owner guarantee to immediately upon Charterers' request remeasure the vessel's DWT for the purpose of satisfying certain port/terminal regulations; such remeasurement will be performed by the Vessel's Registry subject availability. All time and expenses for remeasurement to be for the Charterers' account against Owners' proper documentation and invoice.

## 12.    ITF CLAUSE

Ref. to clause 1. Owners warrant that the vessel has I.T.F. or equivalent certificate on board. In any event of the vessel being delayed by no compliance with the above or being rendered inoperative by strikes, labour stoppages, or by any difficulties due to vessel flag. ownership, crew, terms of employment of officers or, crew, or any other vessel under the same ownership, operation or control, all time lost is to be considered as Off hire and expenses to be for Owners' account.

## 13.    IGS/SBT/COW SYSTEMS CLAUSE

Owners warrant that the vessels is equipped with an inert gas system and segregated ballast tanks on board the vessel and said system are in working order and shall be operational during the duration of this charter.
In the event is required by terminal personnel or independent inspectors to breach the inert gas system for the purpose of gauging, sampling, temperature determination or ascertaining remaining on board quantities after discharge, the master shall comply with these requirements consistent with safe operation of the vessel and regulations of the port.
If requested by Charterers, Owners agree to conduct crude oil washing of all cargo tanks at discharge port(s) simultaneously with discharge operations.
If the above systems are not in good working conditions due to the vessel/crew/Owners' negligence and is causing delay in vessel's normal operations, the vessel will be put off hire for such time actually lost and bunkers consumed shall be for Owners' account.

## 14.    HEATING CLAUSE

Vessel to load cargo up to and maximum 165 degrees Fahrenheit. Vessel to be able through the time charter period to maintain the cargo temperature up to maximum of 135 degrees Fahrenheit. Vessel to heat upto 10 degrees Celsius in 96 hours, but cargo temperature never to exceed 145 degrees Fahrenheit.

## 15.    CLEANING VESSEL

Owners/Master to be at Charterers' disposal for all tank cleaning making full use of the vessel's crew and equipment. Owners, master and crew to use best endeavour to minimise cleaning time and expenses.

## 16.    CAST IRON CLAUSE

Owners warrant that all riser valves and fittings, outboard of the last fixed rigid support to the vessel's deck that are used in the transfer of cargo or ballast will be made of steel or nosular iron and that only one steel reducer or spacer will be used between the vessel's valve and the loading arm. The fixed rigid support must be designed to prevent both lateral and vertical movement of the transfer manifold

## 17.    CARGO RETENTION CLAUSE

In the event that any cargo remain on board upon completion of discharge, Charterers shall have the right to claim against Owners an amount equal to the FOB port of loading value of such cargo plus freight due with respect thereto, provided that volume of such cargo is liquid, pumpable and reachable by vessel's normal discharge equipment as determined by an independent surveyor. The independent surveyor to be mutually agreed by both parties.

## 18.    ELIGIBILITY CLAUSE

Owners warrant the vessel is in all respects eligible under applicable conventions, laws and regulations for trading to the ports and places as specifies under this time charter. Owners warrants that vessel should have onboard for inspection by the appropriate authorities, all certificates, records, compliance letters, contingency plans and other documents required for such service, including but not limited to, the US. Coast Guard Certificate of Financial Responsibility and the Certificate required by the International Convention on Civil Liability for Oil Pollution Damage 1969, as amended.
Owners further warrant that the vessel does, and will comply with all applicable conventions laws, regulations and ordinances of any international, national states or local government entity having jurisdiction including but not limited to the US. Port and Tanker Safely Ad, as amended, the US. Federal Water Pollution Control Act as amended, the International Convention for the Prevention of Pollution from Ships (MARPOL 1973) as amended together with 1978 protocol and 1984 amendments thereto and the International Convention for Safety of Life at Sea (SOLAS 1974) as amended together with 1978 Protocol and 1981/1 983 amendment thereto,

IMO regulations.
Any delays, losses, expenses or damages arising as a result of failure to comply with this clause, shall be for Owner's account and charterers shall not be liable for any delay caused by Vessel's failure to comply the above warranties.

Notwithstanding any other provisions to the contract, if during the currency of the Time Charter party any laws and/or regulations are appraised and engaged prohibiting or restricting the employment of the vessel in her reasonably intended trade, Charterers shall without prejudice have the option to cancel the Time Charter Party, unless Owners decide to make the vessel in full compliance with such laws and/or regulations whereby the vessel can trade fully and freely according to the terms of the Charter Party.

## 19.    COMPLIANCES WITH REGULATIONS

Owners warrant that all trading certificates will remain valid during the course of this Charter Party and the vessel will comply with all regulations in force al the ports within the trading range, as defined in Cl.3 of this rider. If vessel fails to comply with the above, any damages, costs, delays or losses incurred will be, in any case, for Owners account and Charterers shall have the option to put the vessel off-hire. Vessel shall not be put off-hire for alledged non compliances only.

Should new legislations, rules and regulations ho adopted by any country, government body of other legislative authority so to affect the tradeability of the vessel to any country, port or place under the terms of this charter party, then Owners and Charterers undertake to act reasonably in all circumstances, in a spirit of good cooperation, to discuss and find the right solution(s).

## 20.    LIBYAN CERTIFICATE CLAUSE

If required for calls to Libya, Charterers shall arrange for the Vessel's certificates to be translated into the Arabic language for their risk and time, and at Charterer's cost for the translation.

## 21.    O.CI.M.F. CLAUSE

Ref to Clause 1. Owners warrant that the vessel fully complies with Standards and Recommendations OCIMF for Oil Tankers, 1981 International safety Guide for Oil Tankers and Terminals, Standards for Oil Tankers Manifold and Associated Equipment (latest edition), Ship to Ship Transfer Guide (Petroleum) (latest edition) and Recommendation for Equipment Employed in the mooring of the Ship at single point Moorings (latest edition) and any future amendment thereto.
Should new legislations, rules and regulations adopted by any country, government body of other legislative authority so to affect the tradeability of the vessel to any country, port or place under the terms of this charter party, then Owners and Charterers undertake to act reasonably in all circumstances, in a spirit of good cooperation, to discuss and find the right solution(s).

## 22.    VETTING CLAUSE

(1)    0wners shall use their best endeavours to obtain and to maintain at their expenses the approval(s) and/or acceptance(s) of BP-Amoco, Shell, ExxonMobil, Chevtex, TotalFinaElf, Agip, Dreyfus, Statoil Repsol  and any other oil companies as reasonably required by charterers.

(2)    Owners shall expedite as far as practicable such approval(s) and/or acceptance(s) process and shall endeavour to have at least ExxonMobil, BP-Amoco, Chevtex and Shell in place within three (3) months after the vessel's delivery under this charter and the other major oil companies within six (6) months after the vessel's delivery under this charter, provided that inspectors  are available at discharge port(s) and Owners request for vetting inspections  are not declined unreasonably by oil company(ies) reasons(s).

(3)    If during the charter the vessel  is found to be unacceptable by any of the above major oil companies, owners will immediately  take steps to rectify any outstanding deficiencies at owners' expense and shall have the vessel re-inspected and accepted by the involved major oil company provided that inspectors are available at discharge port(s) and Owners request for re-inspections are not declined unreasonably by oil company(ies) reason(s).

(4)    In the event that

   (a)    either the vessel fails to obtain the approval(s) and/or acceptance(s) as per paragraph  2)above and she remains unacceptable for one or more oil  companies for fortyfive (45) days after the time limit provided therein are expired, or

   (b)    the vessel remains unacceptable for any of the above major oil companies as per paragraph 1) above for fortyfive (45) days after she has been found unacceptable as per paragraph 3) above,

Charterers shall have the right to put the vessel off hire until missing approval(s) and/or acceptance(s) are reinstated.

## 23.    PERIOD AND OPTION

Owners agree to let and Charterers agree to hire the vessel for a period of 5 (five) years with thirty (30) days more or less in charterers option.

## 24.    PUMPING CLAUSE

Owners warrant vessel is capable of discharging her entire cargo within 24 hours or maintain 100 PSI at ship's rail provided shore facilities are capable of receiving same. If vessel fails to maintain this discharge rate, Owners are to instruct master to clarify by protest letter or remarks in time sheets, countersigned by receivers, the reason of such failure. If vessel's performance is below above referenced standard and pumping is delayed due to vessel's deficiency, owners shall be responsible for any excessive pumping time and should it become necessary to withdraw the vessel from the berth all expenses are to be for Owners' account and time to be considered off-hire. Additional time to be allowed for COW in accordance with vessel's technical description.

*25.*   **LOI CLAUSE**

**STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO WITHOUT PRODUCTION OF THE ORIGINAL BILL OF LADING**

To                              (insert name of Owners)              (insert date)
                                (insert address)
The Owners of the               (insert name of ship)


Dear Sirs,

Ship:                           (insert name of ship)
Voyage                          (insert load and discharge ports as stated in the bill of lading)
Cargo:                          (insert description of cargo)
Bill of Lading:                 (insert identification number, date and place of issue)


The above cargo was shipped on the above ship by *[insert name of shipper]* and consigned to *[insert name of consignee or party to whose order the bill of lading is made out, as appropriate]* for delivery at the port of *[insert name of discharge port stated in the bill of lading)* but the bill of lading has not arrived and we, *[insert name of party requesting delivery]*, hereby request you to deliver the said cargo to *[insert name of party to whom delivery is to be made]* at *[insert place where delivery is to be made]* without production of the original bill of lading.
In consideration of your complying with our above request, we hereby agree as follows:

1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of delivering the cargo in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should ho arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use of trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any

liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4. If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivery to the party to whom we have requested you to make such delivery.

5. As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you, whereupon our liability hereunder shall cease.

6. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.


Yours faithfully

For and on behalf of
*[insert name of Requestor]*
The Requestor

………………………………
Signature




**STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO AT A PORT OTHER THAN THAT STATED IN THE BILL OF LADING**

| To | (insert name of Owners) | (insert date) |
|----|-------------------------|---------------|
|    | (insert address)        |               |
| The Owners of the | (insert name of ship) |   |

Dear Sirs,

| | |
|---|---|
| Ship: | (insert name of ship) |
| Voyage | (insert load and discharge ports as stated in the bill of lading) |
| Cargo: | (insert description of cargo) |
| Bill of Lading: | (insert identification number, date and place of issue) |

The above cargo was shipped on the above ship by  (*insert name of shipper*) and consigned to (*insert name of consignee or party to whose order the bill of lading is made out, as appropriate*) for delivery at the port of (*insert name of discharge port stated in the bill of lading*) but we, (*insert  name of party requesting substituted  delivery*), hereby request to orders the ship to proceed to and deliver the said cargo at (*insert name of substitute port of place of delivery* ) against production of at least one original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:

1. To indemnity you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving delivery of the cargo against production of at least one original bill of lading in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3. If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4 The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

5. This indemnity  shall be governed by and construed in accordance with English law and each and every person liable under this  indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully
For and on behalf of
*[insert name of Requestor]*


The Requestor


………………………………..
Signature


## STANDARD FORM LETTER OF INDEMNITY TO BE GIVEN IN RETURN FOR DELIVERING CARGO AT A PORT OTHER THAN THAT STATED IN THE BILL OF LADING AND WITHOUT PRODUCTION OF THE ORIGINAL BILL OF LADING.


To                              (insert name of Owners)              (insert date)
                                (insert address)
The Owners of the             (insert name of ship)


Dear Sirs,
Ship:                          (insert name of ship)
Voyage                         (insert load and discharge ports as stated in the bill of lading)
Cargo:                         (insert description of cargo)
Bill of Lading:                (insert identification number, date and place of issue)


The above cargo was shipped on the above vessel by *[insert name of shipper)* and consigned to *[insert name of consignee or party to whose order the bills of lading are made out, as appropriate)* for delivery at the port of *[insert name of discharge port stated in the bill of lading]* but we, *[insert name of party requesting substituted delivery]*, hereby request you to order the vessel to proceed to and deliver the said cargo al *[insert name of substitute port or place of delivery]* to *[insert name of party to whom delivery is to be made]* without production of the original bill of lading.


In consideration of your complying with our above request, we hereby agree as follows:

    1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving delivery of the cargo in accordance with our request.

    2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid,

to provide you or them on demand with sufficient funds to defend the same.

2.      If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should ho arrested or

3.      detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether  or not such arrest or detention or threatened arrest  or detention or such interference may be justified.

4. If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivery to the party to whom we have requested you to make such delivery.

5. As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you.

6. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully
For and on behalf of
*[insert name of Requestor]*
The Requestor

......................................
Signature

## 26. OVERPERFORMANCES CLAUSE

Notwithstanding anything contained in clause 24 hereabove, Charterers will not pay more than the rate provided in clause 8 and Owners are not entitled  to ask compensation for vessel overperformances.

## 27. LMAA ARBITRATION CLAUSE

All disputes or differences arising out of this contract which cannot be amicably resolved shall be referred to arbitration in London. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party. In the case of arbitration on documents, if the two arbitrators so appointed are in agreement their decision shall be final. In all other cases the arbitrators so appointed shall appoint a third arbitrator and the reference shall be the three-man tribunal thus constituted.

If either the appointed arbitrators refuses to act or is incapable of acting, the party who appointed him shall appoint a new arbitrator in his place.

If one party fails to appoint an arbitrator, whether originally or by way of substitution for two (2) weeks after the other party, having appointed his arbitrator, has (by telex or letter) called upon the defaulting party to make the appointment, the president for the time being of the London Maritime Arbitrators Association, shall upon application of the other party, appoint an arbitrator on behalf of the defaulting party and that arbitrator shall have the like powers to act in the reference and make an award (and, if the case so requires, the like duty in relation to the appointment of a third arbitrator) as if he had been appointed in accordance with the terms of the agreement..

This contract is governed by English Law and there shall apply to all proceedings under this clause the Terms of the London Maritime Arbitrators Association current at the time when the arbitration proceeding were commenced. All appointees shall be member of the Association..

## 28 I.T.O.P.F. CLAUSE

Notwithstanding anything to the contrary in this Charter, there shall be no obligation upon the Owner or the Vessel to be a participant in the tanker Owners voluntary agreement concerning liability for oil pollution dated January 7th. 1969 as amended ("TOVALOP"). Owner, however, warrants that it is a member of the International Tanker Owners Pollution Federation ("ITOPF") and that Owner will retain such membership during the entire period of the services of the Vessel under this Charter.

## 29. VESSEL'S MAINTENANCE CLAUSE

Upon reasonable notice, Owners to give to Charterers reasonable access to all documents regarding the vessel's performances whether aboard, ashore in Owners' or Owners Management's office together with reasonable access to the vessel for inspection purposes.

Owners and Charterers agree that a meeting will take place as often as necessary, but al least twice a year, between Owners and Charterers' technical staff in order to review and ensure prompt settlement of any technical problem that may have arisen.

During the charter party period(s), the Charterers to have the option every six (6) months to arrange for an independent surveyor to inspect the vessel at Charterers cost and expenses. The copy of the inspection report to be supplied to both Owners and Charterers.

## 30.    VESSEL'S FLAG AND CLASSIFICATION SOCIETY

For the duration of the charter party period the Owners will register the vessel into the German International Registry and simultaneously into the Cayman Island Bareboat Registry and fly its flag. If, however, and as long as during the period of the Charter Party this dual registrations is not possible the vessel will fly the German flag. The Owners will take delivery of the vessel built and classed under ABS and intend to maintain this classification during the period of the Charter Party. Owners have the option to change classification   within   the IACS group for important reasons only.

War Clause
(clause n. 33 of Indertanktime 80 in substitution of 'War Risk Clause' n. 35 of Shelltime 4)

### 31. Additional War Expenses

If the Vessel is ordered to trade in areas were there is war (de facto r de jure) or /and where the area in question has been declared additional war risk premium areas by the Vessel's war risk insurers. Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably incurred by  Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event when such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claim by owners under their war risk insurance arising out compliance with such orders. For the purpose of this Charter Party, Charterers liability for war risk insurance premiums is to be based upon the insured value of the Vessel, which at delivery is United States Dollars (insured value to be advised) Charterers to benefit from rebates from hull insurers on war risk insurance premiums.

### 32. War Risks

(a)The Master shall not be required or bound to sign Bills of Lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the Vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions, or revolutions.
(b) If in reasonable opinion of the Master or Owners it becomes, for any of the reasons set out in Clause 32 (a) or by the operation of international law, dangerous, impossible or prohibited for the Vessel to reach or enter, or to load or discharge cargo at, any place to which the Vessel has been ordered pursuant to this Charter, (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this Charter (provided such other place is not itself a place of peril). If any place of discharge is or become a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo of such part of it as may be affected at any place which they or the Master may in their or his descretion  select within the trading limits of

this charter and such discharge shall be deemed to be due fulfilment of Owner's obligations under this Charter so far as cargo so discharge is concerned.

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, water, delivery or any other wise whatsoever given by the government of the state under whose flag of the Vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including de facto government or local authority or by any committee or person having under the terms of war risks insurance on the Vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to any place of discharge to which she has been ordered pursuant to this Charter, the Vessel may proceed to any place which the master or Owners in his or their opinion select and their discharge the cargo or such part of it as may be affected.

Such discharge shall be deemed to be due fulfilment of Owners' obligations under this Charter so far as cargo so discharged is concerned.

Charterers shall procure that all Bill of Lading issued under this Charter shall contain the Chamber of Shipping War Risks clause 1952. See clause 31 (Additional War Expenses).

Owners to be entitled to insure their interest in the vessel for such terms as they deem fit up to its total insured value and also in the hire against any of the risks likely to be involved thereby, and Charterers shall make refund on demand of any additional premium thereby incurred and

1.Notwithstanding the terms of Clause 20 hire shall be payable for all time lost including any loss owing to loss or injury to the Master, officers or crew or to refusal by the Master, officer or crew to proceed to such zone or to be exposed of such risks.

2.In the event of the wages of the Master and/or officers and/or crew and/or the cost of provisions and/or stores for deck and/or engine room and/or insurance being increased by reason of or during the existence of any of the matter mentioned in Section (A) the amount of any increase shall be added to the hire and paid by the Charterers on production of Owners' account thereof.

Furthermore, notwithstanding any other provision of this Charter Party, any war bonus payable to Master and/or officers and/or crew shall be for Charterers'account.

## 33    Vessel's Tracking Clause

Is is agreed that Charterers may from the time of fixing until completion of the Charter period employ an Inmarsat C Tracking system on the Vessel. All registration/communication costs relating to this tracking system will be for the Charterers' account. Charterers will advise when the system is operative and confirm termination upon completion of Charter. Owners to supply Inmarsat C number (9 digits, beginning with 4), manufacturer, make etc, model No., terminal S/W version prior to vessel's delivery.

## 34    War P&I Liabilities Inclusion Clause

Owners to ensure that Hull War Risk insurance incorporates provisions for War P & I liabilities inclusion clause.

**35    Security Clause**

The security of the vessel, her officers and crew, and cargo is of paramount importance to the Charterers. In light of the potential threat of terrorism, piracy, and other security threats worldwide, Owner will exercise due diligence and make best efforts to ensure the safety and security of the vessel, her officers and crew, and cargo at all times during the term of this charter party.

Owners should take all steps to ensure their compliance with the provisions of SOLAS Chapter XI-2 "Special Measures to Enhance Maritime Security" and the International Code for the Security of Ship and Port Facilities (ISPS Code) prior 01 July 2004 and maintain the vessel in possession of a valid International Ship Security Certificate (ISSC) for the duration of this charter.

In the eventuality of some Government Authorities (e.g. USCG) requiring a separate endorsement for compliance with the non mandatory Part B of the ISPS code, Owners will exercise due diligence and make best efforts to ensure that all provisions necessary for such endorsement or approval are obtained prior to vessels call at that Governments port facilities.

Addendum No. 1 to the

**Charter Party**

Dated 31st July 2003 (the "C/P")
made between

Messrs Milan Shipping Company Limited (the "Charterers") and

A company to be nominated by Messrs. Jacob Tankschiffahrtsgesellschaft
GmbH & Co. Kg.(the "Owners")

in respect of the

M/v "Los Roques" (the "Vessel")

It is hereby mutually agreed between the Sellers and the Buyers that on delivery of the Vessel, the Charterers to hand over to Owner a letter on Scorpio Ship Management S.A.M. headed paper, signed by Scorpio Ship Management S.A.M. as per following wording:

To: The Owners of M/v 'Los Roques'

Dear Sirs,

**M/v "Los Roques"**

We refer to the time charterparty dated 31st July 2003 and any amendments or supplements thereto (the "Charterparty") between you as owners and Messrs Milan Shipping Company Limited (the "Charterer") as charterer under which the M/v "Los Roques" (the "Vessel") has been chartered by the Charterer for a fixed period of five years or such longer period at Charterer's option (the "Charter Period").

In consideration of your entering into the Charterparty we hereby guarantee to you the due and full performance by the Charterer of all its obligations under or in connection with the Charterparty and the full payment by the Charterer on the due dates of each and every sum payable now and hereafter under or in connection with the Charterparty.

Our liability hereunder shall not be affected by any act, omission, matter or thing which, but for this provision, might operate or release or otherwise exonerate us from our liabilities and obligations hereunder including any extensions of time or indulgences which may be given by you to the Charterer and to any modifications of the Charterparty which you and the Charterer may from time to time agree upon.

Our liability hereunder shall not be limited to amounts actually due and payable from the Charterer to you under the terms of the Charterparty but shall include in case of premature cancellation of the Charterparty due to a default of the Charterer under the terms of the Charterparty any claims for damages should the Vessel not be employed during the entire Charter Period under a subsequent charter on such terms and conditions equivalent to the terms and conditions the Charterparty. The

amount so guaranteed shall be reduced by any amounts in respect of which the Charterer is entitled to make deduction or set-off under the terms of the Charterparty or by law. In the event of any dispute arising between you and the Charterer as to whether any amounts is due and payable under the terms of the Charterparty or by law we shall be irrevocably bound by the final Arbitration award made the arbitrators under the provisions of the Charterparty or by a final decision the High Courts of Justice in London against presentation to us a copy of such Final Arbitration Award made by the Arbitrators or of such Final judgement of the High Court of Justice of London, as the case may be, stating the amount due to yourselves in final settlement of claims mounted under the Charter Party.

Notices shall be given to us at our address or fax (confirmed by letter) specified below.

This guarantee or the benefits hereof shall not be assigned to any third party without our prior written consent other than by way of security to the bank financing the Vessel.

This Guarantee shall become effective upon delivery of the Vessel to the Charterers. It shall expire three months after re-delivery of the Vessel to the Owners in accordance with the terms and conditions of the Charter Party if, by the end of three months period no proceedings have been commenced before London Arbitration Tribunal or High Court of Justice in London pursuant to the Charter Party. This Guarantee shall be returned by the Owners to the undersigned upon its expiration.

This guarantee shall be governed and construed in accordance with English Law, legal venue in London. We hereby appoint Messrs........ (Telephone: +44- Telefax: +44-) as our agent for service of progress or other legal summons in connection with any actions or proceedings in UK arising under this  Letter of Guarantee following lifting of subjects for the Charter and inform you of details.

Please confirm your acceptance of the terms of this guarantee by signing the attached copy of this letter.


On behalf of the Charterers

MILAN SHIPPING COMPANY LIMITED
VALLETTA - MALTA

On behalf of the Owners

JACOB TANKSCHIFFAHRTS-
GESELLSCHAFT MBH & CO. KG

Dated                                                    2007

(1)     LOS ROQUES SHIPPING LIMITED

(2)     BP OIL INTERNATIONAL LIMITED

---

## Settlement agreement

---

Exh. 2

**THIS SETTLEMENT AGREEMENT** is made on          June 2007

**BETWEEN :**

(1)     Los Roques Shipping Limited ("Owners")

(2)     BP Oil International Limited ("BP)

Together the "Parties"

**BACKGROUND**

• On or about 28 March 2005, a cargo of Russian Light Crude Oil and Zaikinskaya Crude Oil (together the "Cargo") was loaded on board the Owners' vessel MT "Los Roques" (the "Vessel") at Novorossiysk. Bills of Lading numbered 1-12 were issued in respect of the Cargo (the "Bills of Lading").

• The Vessel proceeded to Trieste where she discharged the Cargo.

• Subsequent to discharge, BP, the endorsee of the Bills of Lading, advanced a claim for alleged shortage of Cargo in the sum of US $225,089.70 plus interest and costs.

• The Owners have now agreed to pay US $190,000 (United States Dollars one hundred and ninety thousand) to BP in full and final settlement of all claims whatsoever and howsoever arising under the Bills of Lading.

**OPERATIVE PROVISIONS**

1.     **PAYMENT**

1.1     Owners shall pay to BP the total sum of US $190,000 (United State Dollars one hundred and ninety thousand) on or before 15 June 2007 in full and final settlement of all disputes between the Parties.

1.2     The payment of US $190,000 is to be remitted by direct transfer to the following receiving account:

Bank:           HSBC International Branch

                27-32 Poultry, London, EC2P 2BX

Account Name:   Pequod Associates Limited

Sort Code:      40-05-15

Account No:     58553272

IBAN (SWIFT):   GB53 MIDL 4005 1558 5532 72

BIC:          MIDLGB22

1.3     Each party is to bear its own costs, legal or otherwise.

1.4     Immediately upon receipt of funds into the above account BP will return the Steamship Mutual P&I Club LOU for cancellation.

## 2.     ACCORD AND SATISFACTION

2.1     In consideration of the mutual promises in this Agreement, the sufficiency of which is agreed by all Parties, this Agreement constitutes a full and final settlement of all claims, and to the satisfaction of all existing causes of action that the Parties may have against each other arising out of or in connection with or under the Bills of Lading including interest and costs, whether or not such claims are known to, have been notified to, or are in the present contemplation of the Parties.

## 3.     GOVERNING LAW AND JURISDICTION

3.1     The formation, existence, construction, performance, validity and all aspects whatsoever of this Agreement or of any term of this Agreement will be governed by the laws of England and Wales.

3.2     The courts of England and Wales will have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement. The Parties irrevocably agree to submit to that jurisdiction.

## 4.     ·  COUNTERPARTS

This Agreement may be executed  in any number of counterparts, each of which so executed will be an original, but together will constitute one and the same instrument.

**SIGNED BY** the duly authorised representatives of the Parties on the date stated at the beginning of this Agreement.

Signed .................................................

Name ...STEPHEN.. MACH...  EVERSHEDS LLP

For and on behalf of Los Roques Shipping Limited

Signed .................................................

Name ...ANDREW BASS.., DIRECTOR, PEQUOD ASSOCIATES

For and on behalf of BP Oil International Limited